# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.) No. 18-0142** (Harrison County 17-F-103-1)

**Shelby C.,**
**Defendant Below, Petitioner**

**FILED**

**September 13, 2019**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Shelby C., by counsel Bryan D. Church, appeals the Circuit Court of Harrison County's January 22, 2018, order following her convictions of child abuse creating substantial risk of death or serious bodily injury and child abuse resulting in bodily injury.[1] The State, by counsel Holly M. Flanigan, filed a response. On appeal, petitioner alleges that the circuit court erred in excluding evidence of abuse of the minor victim's sibling, not requiring the State to issue a bill of particulars prior to trial, denying her various motions for a judgment of acquittal, and instructing the jury regarding the doctrine of principal in the second/aider and abettor.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

On July 7, 2016, petitioner transported her then three-year-old son, D.H., to the emergency room at United Hospital Center in Bridgeport, West Virginia, for an issue with the child's penis and a facial rash. Petitioner's boyfriend and mother accompanied petitioner and the child to the hospital. Nurse Andrew Grogg was the first medical provider to examine the child. The child's injuries included a petechial rash to his face and neck; significant bruising to his neck, jawline, and face; swelling around his eyes; a cough commonly associated with strangulation; severe

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

bruises on the inside and outside of his ears; significant and symmetrical bruising to his thighs; and severe bruising and swelling to his penis and groin area. According to petitioner, the child had what she believed to be an erection for approximately two days and she suggested the swelling could have been caused by a hair being wrapped around the child's penis. Petitioner reported that the only accident the child had in the preceding days was a fall from a swing. Petitioner explained that the child had not been vomiting or coughing, and she had no explanation for the petechial rash other than he had "little red dots" on his face and was "paler than usual" when he awoke from his nap that day.

Later, at trial, Mr. Grogg testified that the child's injuries suggested that an amount of pressure was applied to the child's neck and lower jaw. Mr. Grogg also explained that petechial rashes are rare in children and are caused by an increase in venous pressure. He also explained that activities such as strangulation, severe and prolonged coughing, "horrendous vomiting," and a "sleeper hold" amongst wrestlers can cause a petechial rash. No such illnesses or wrestling moves were reported by petitioner to explain the child's injuries. Because of the "fingertip-like" bruising to the child's neck, face, and jaw, and the petechial rash, Mr. Grogg suspected child abuse and consulted with Nurse Practitioner John Huber. Once Mr. Huber examined the child, he immediately suspected child abuse and later testified at trial that "[i]t's not normal to see petechiae on a child." After Mr. Huber examined the child, Child Protective Services ("CPS") was notified. Dr. Stuart Godwin examined the child and also suspected child abuse. Dr. Godwin noted that the bruising around the child's face, eyes, chest, shoulders, and neck were at various stages of healing, which indicated that the injuries were nonaccidental. The medical professionals ordered testing to rule out possible medical causes for the child's injuries. Blood work, IV fluids, x-rays, urinalysis, and other physical examinations ruled out medical causes for the bruising, petechiae, and injured penis, and revealed that the child's jaw was dislocated.

CPS worker Caryn Woofter responded to the call from the medical professionals on July 7, 2016. Mr. Grogg reported to her that the child's injuries were not consistent with explanations from petitioner and her boyfriend. Ms. Woofter then went to the child's hospital room and asked petitioner for permission to see the injuries. At that time, petitioner's boyfriend became irate, hostile, and verbally aggressive. Ms. Woofter turned on the light in the hospital room and immediately noticed the bruises to the child's neck, jawline, and legs, and saw red "pock marks" on the child's face. Petitioner and her boyfriend told Ms. Woofter that the bruises were from the child "face planting" off a swing at the playground. The Department of Health and Human Resources later took emergency custody of the child after determining that the child had been in the sole custody of petitioner and her boyfriend.

Sergeant Dixon Pruitt of the Harrison County Sheriff's Department arrived at the hospital during the early morning hours on July 8, 2016, in response to the hospital's report of suspected child abuse. Mr. Grogg informed Sergeant Pruitt that petitioner's explanation for the child's bruising was that the child fell off of a swing, but the bruises were inconsistent with that type of injury. While still in the hospital under observation, the child's appearance changed. The medical professionals explained at trial that the child's bruises grew darker and more prominent under their watch, however, the swelling under the child's eyes and the petechial rash reduced. Because the bruises were changing over time, Mr. Grogg and Mr. Huber felt it was crucial to photograph the injuries. When the medical professionals asked petitioner and her boyfriend for permission to

photograph the child's injuries, petitioner and her boyfriend "screamed" and "yelled." Petitioner's boyfriend became hostile and immediately instructed petitioner that it was her right to refuse to allow photographs, which petitioner then did.

On July 11, 2016, Sergeant Pruitt interviewed petitioner at the sheriff's department. Chief Deputy Pat McCarty of the Harrison County Sheriff's Department was in a separate room and watched the interview. According to Chief Deputy McCarty, petitioner's interview made "absolutely no sense. She was changing her story. It was—she would change it if Sergeant Pruitt said this doesn't match up, she would change her story." According to the law enforcement officers, petitioner gave a variety of explanations for the child's injuries, including that she tickled the child's thighs, the child fell on a slide, the child fell off a bed and struck the nightstand, the child held his breath, the child fell off a swing, and that a hair wrapped around the child's penis. She repeatedly denied intentionally causing any injuries to the child and denied that her boyfriend harmed the child. Petitioner's boyfriend initially agreed to speak with the law enforcement officers, but after receiving a *Miranda*[2] warning, he refused to answer questions and left the police station.

The Harrison County Grand Jury indicted petitioner in May of 2017. Petitioner was indicted for the following felony offenses: child abuse creating substantial risk of death or serious bodily injury in violation of West Virginia Code § 61-8D-3(c); conspiracy to commit child abuse creating substantial risk of death or serious bodily injury in violation of West Virginia Code § 61-8D-3(c) and West Virginia Code § 61-10-31; strangulation in violation of West Virginia Code § 61-2-9d; child abuse resulting in bodily injury in violation of West Virginia Code § 61-8D-3(a); and conspiracy to commit child abuse resulting in bodily injury in violation of West Virginia Code § 61-8D-3(a) and West Virginia Code § 61-10-31. Prior to trial, petitioner moved the circuit court to direct the State to file a bill of particulars, which the circuit court denied.

Petitioner's jury trial commenced on November 6, 2017, and continued until November 12, 2017. In regard to when the child was injured, the child's grandparents and petitioner both testified that the child did not have any injuries on July 4, 2016. Further, testimony established that petitioner and her boyfriend were the sole caregivers of the child after the July 4, 2016, celebration until they took the child to the hospital on July 7, 2016. In fact, petitioner testified that she was the only person who cared for the child for approximately thirty hours prior to taking the child to the emergency room. Medical testimony established that the child's injuries occurred just before his admission to the hospital on July 7, 2016. According to the medical professionals, the presence and dissipation of petechiae, which generally disappear within twenty-four hours, and the bruising that darkened during the initial hours in the emergency room indicated to Dr. Paul Davis that there "was a very recent traumatic event, prior to—just prior to his coming to the hospital." Mr. Huber likewise testified that the petechiae "had to be fairly fresh . . . it would have to be within a few hours." Concerning the injury to the child's penis, medical testimony established that the injury occurred one or two days prior to the child's admission to the hospital. The medical professionals refuted petitioner's theories that the child had an erection or that a hair caused the injury to the child's penis and explained that someone without medical training should have been able to differentiate between an erection and a bruised, injured penis.

---

[2]*See Miranda v. Arizona*, 384 U.S. 436 (1966).

Furthermore, both the medical professionals and law enforcement testified at trial that it was highly unusual for a parent to refuse to allow photographs to document injuries to her child. Chief Deputy McCarty became involved in the case after petitioner and her boyfriend refused to allow photographs to be taken of the child. Chief Deputy McCarty applied for and obtained a warrant authorizing the photographs of the child. He testified at trial that he saw "the hand mark on [the child's] face. The bruises on one side, the bruises on the other . . . I recognized it as it appeared to be a hand. You've got a thumb on one side, you've got fingers on the other." Dr. Paul Davis, the child's physician, also testified that the bruises on the child's cheeks were consistent with a person grabbing his cheeks. Dr. Davis further explained that he could not "conceive of an injury to the penis that wasn't it being grabbed." According to Dr. Davis, someone inflicted the injuries on the child. Mr. Huber testified that the abuse that the child suffered could have caused substantial health problems, or even death. Mr. Huber's testimony also refuted the possibility that tickling, prolonged tickling, playful pinching over a period of time, swings, or diapers caused the child's bruising.

Following the presentation of testimony, when discussing jury instructions, petitioner objected to the circuit court instructing the jury regarding principal in the second/aider and abettor. The circuit court noted petitioner's objection. Petitioner was ultimately convicted of child abuse creating substantial risk of death or serious bodily injury and child abuse resulting in bodily injury. She was acquitted of the charges relating to strangulation and conspiracy. Following the verdict, petitioner filed timely post-trial motions seeking relief in the form of a judgment of acquittal, as well as a new trial, which the circuit court denied. The court suspended the imposition of a sentence and placed petitioner at the Anthony Correctional Center for Youthful Offenders for a period of no less than six months and no more than two years. It is from the circuit court's January 22, 2018, order that petitioner appeals.

We have previously held as follows:

> "In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review." Syl. Pt. 2, *Walker v. West Virginia Ethics Comm'n*, 201 W.Va. 108, 492 S.E.2d 167 (1997).

Syl. Pt. 2, *State v. Bruffey*, 207 W. Va. 267, 531 S.E.2d 332 (2000). Upon our review, we find no error in the circuit court's proceedings.

First, petitioner argues that the circuit court erred in excluding "any mention of, inquiry into or introduction of evidence" regarding alleged sexual abuse of the minor victim's sibling, G.C. According to petitioner, G.C. revealed during a forensic interview that she had been sexually abused by a friend of a relative in her grandparents' home. Petitioner contends that the evidence was relevant to identifying the actual perpetrator and that its probative value was not substantially outweighed by any danger of unfair prejudice, confusing the issues, or misleading the jury. Specifically, petitioner asserts that the State had "no direct evidence that the [p]etitioner actually caused any harm to the minor victim, that the identity of the perpetrator was a significant issue at

4

trial, [and] the existence of other potential sources of injury to the child is significantly probative." We disagree.

We review "[a] trial court's evidentiary rulings, as well as its application of the Rules of Evidence, . . . under an abuse of discretion standard." Syl. Pt. 4, in part, *State v. Rodoussakis*, 204 W. Va. 58, 511 S.E.2d 469 (1998). "The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." Syl. Pt. 10, *State v. Huffman*, 141 W. Va. 55, 87 S.E.2d 541 (1955), *overruled on other grounds by State ex rel. R.L. v. Bedell*, 192 W. Va. 435, 452 S.E.2d 893 (1994).

In regard to the relevancy of evidence, Rule 401 of the West Virginia Rules of Evidence provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Petitioner argues that the evidence of G.C.'s alleged abuse in the grandparents' home was relevant because the State did not present any direct evidence of who, if anyone, intentionally inflicted harm to D.H. At times, D.H. and his sibling lived in the grandparents' home and, according to two of the State's witnesses, the redness and injury to D.H.'s penis indicated sexual abuse. However, petitioner ignores the fact that evidence established that the child sustained injuries while in petitioner's custody, not in the grandparents' home. In short, there is no set of circumstances possible under the evidence introduced below wherein anyone other than petitioner or her boyfriend could have inflicted the child's injuries. Therefore, petitioner's attempt to introduce evidence in an effort to cast someone in the grandparents' home as the perpetrator of the crimes herein was properly denied. Additionally, although two of the State's witnesses testified that they had concerns that D.H. was sexually abused, the circuit court expressly instructed the jury to "disregard any comment made by the witness regarding sexual abuse." Concerning the CPS worker's references to sexual abuse, the circuit court instructed the jury "to disregard any reference to any sexual abuse, that is not an allegation in this case. So any reference whatsoever to that should not play into any of your considerations in this case." As such, we find no error in the exclusion of this evidence since it was wholly irrelevant.

Next, petitioner argues that the circuit court erred in not requiring the State to file a bill of particulars prior to trial. In support, petitioner avers that "the language of the indictment was so vague and lacking in specificity as to the *actus reas* that it severely impacted the [p]etitioner's ability to adequately respond to the allegations and prepare for trial." Petitioner also contends that the "State did not provide any factual specificity to enable the [p]etitioner to determine what conduct was alleged to have constituted child abuse" in counts one and five. She further argues that the indictment was so ambiguous that it restricted her ability to assert double jeopardy protections for any subsequent prosecution. We do not find this argument to be persuasive.

Concerning our review of a circuit court's ruling on a motion for a bill of particulars, we have held as follows:

> "The granting or denial of a motion for a bill of particulars . . . rests in the sound discretion of the trial court, and unless it appears that such discretion is

5

abused the ruling of the trial court will not be disturbed." Syllabus Point 7, in part, *State v. Nuckols,* 152 W.Va. 736, 166 S.E.2d 3 (1969).

Syl. Pt. 2, *State v. Fairchild*, 171 W. Va. 137, 298 S.E.2d 110 (1982). This Court has also noted that when the charges in an indictment are described with sufficient particularity to inform a defendant fully and plainly of the character and the cause of the accusation, no bill of particulars is necessary. *See State v. Hudson*, 128 W. Va. 655, 661, 37 S.E.2d 553, 557 (1946). Further, "[a]n indictment for a statutory offense is sufficient if, in charging the offense, it adopts and follows the language of the statute, or uses substantially equivalent language, and plainly informs the accused of the particular offense charged and enables the court to determine the statute on which the charge is founded." Syl. Pt. 3, *State v. Slie*, 158 W. Va. 672, 213 S.E.2d 109 (1975) (quoting syl. pt. 3, *Pyles v. Boles*, 148 W. Va. 465, 135 S.E.2d 692 (1964)).

Here, there was no reason to require a bill of particulars because each count of the indictment expressly identified the relevant statute, closely tracked the statutory language, provided the date range during which each offense allegedly occurred, and identified the victim as to each offense. Count one of the indictment charged petitioner with child abuse creating substantial risk of death or serious bodily injury, pursuant to West Virginia Code § 61-8D-3(c) which provides that "[a]ny parent, guardian or custodian who abuses a child and by the abuse creates a substantial risk of death or serious bodily injury, as serious bodily injury is defined in section one, article eight-b of this chapter,[3] to the child is guilty of a felony." (Footnote added). Count one of the indictment charged as follows:

> That on or about and between the __ day of June 2016 and the 7th day of July 2016, in Harrison County, West Virginia [petitioner], a parent of [D.H.], an unemancipated male child whose date of birth is . . . , committed the offense of Child Abuse Creating Substantial Risk of Death or Serious Bodily Injury by unlawfully, intentionally, and feloniously abusing [D.H.] and by the abuse creating a substantial risk of death or serious bodily injury to [D.H.], against the peace and dignity of the State.

Count five of the indictment charged petitioner with child abuse creating substantial risk of death or serious bodily injury, pursuant to West Virginia Code § 61-8D-3(a) which provides as follows: "If any parent, guardian or custodian shall abuse a child and by such abuse cause such child bodily injury as such term is defined in section one, article eight-b of this chapter,[4] then such parent, guardian or custodian shall be guilty of a felony." (Footnote added). Count five of the indictment charged as follows:

> That on or about and between the __ day of June 2016 and the 7th day of July, 2016, in Harrison County, West Virginia, [petitioner], . . . a parent of [D.H.],

---

[3]West Virginia Code § 61-8B-1(10) defines "serious bodily injury" as "bodily injury which creates a substantial risk of death, which causes serious or prolonged disfigurement, prolonged impairment of health or prolonged loss or impairment of the function of any bodily organ."

[4]West Virginia Code § 61-8B-1(9) defines "bodily injury" as "substantial physical pain, illness or any impairment of physical condition."

committed the offense of Child Abuse Resulting in Bodily Injury by unlawfully, intentionally, and feloniously abusing [D.H.], an unemancipated male child . . . by inflicting physical injury by other than accidental means upon [D.H.] and by such abuse, [petitioner] did cause bodily injury to [D.H.], against the peace and dignity of the State.

Because the indictment followed the language of the relevant statutes and informed petitioner of the crimes for which she was being charged, it was unnecessary for the circuit court to require the State to provide a bill of particulars. The circuit court noted in its order denying petitioner's motion for a bill of particulars that any further information could be obtained through the discovery process and that the requested details "would become apparent through the regular preparation and investigation for trial."

In regard to her argument that she was unable to assert double jeopardy protections, West Virginia Code § 62-2-10 provides that "[n]o indictment or other accusation shall be quashed or deemed invalid . . . for omitting to state, or stating imperfectly, the time at which the offense was committed, when time is not of the essence of the offense." Further, in *State v. David D.W.*, 214 W. Va. 167, 588 S.E.2d 156 (2003), the defendant was indicted on multiple counts of sexual abuse by a parent, guardian, or custodian and, on appeal, argued that the indictment was deficient because it failed to include specific dates on which the alleged offenses were to have occurred. The Court disagreed and concluded that

[c]learly, time is not an element of the offenses with which the appellant was charged. Thus, there was no requirement that the indictment in this case specify exactly when the alleged offenses occurred. Moreover, this Court has explained that "[a] conviction under an indictment charged, though the proof was at variance regarding immaterial dates, precludes a subsequent indictment on the exact same material facts contained in the original indictment."

*Id.* at 173, 588 S.E.2d at 162 (citations omitted). Because time is not an element of child abuse as set forth in West Virginia Code § 61-8D-3, there was no requirement that the indictment specify when the alleged offenses occurred. Nevertheless, the indictment included a timeframe, thereby precluding subsequent indictment on the same material facts contained in the original indictment. Thus, we find that the indictment was sufficient, followed the language of the statutes, and set forth the relevant time frame and necessary information regarding the victim's injuries to allow petitioner to prepare for trial. As such, we find no error in the circuit court's denial of petitioner's motion for a bill of particulars.

Next, petitioner argues that the circuit court erred in denying her motions seeking judgment of acquittal on counts one and five because the evidence was insufficient to support the convictions. She asserts that there was no evidence to demonstrate that she actually caused the child's injuries or that she was present when the child was injured. She contends that there was no evidence presented at trial demonstrating that the child was harmed by other than accidental means. Petitioner also states that D.H. was diagnosed with autism and that his primary care physician testified that children with autism may engage in self-injurious behavior. Petitioner avers that "the minor victim very well may have engaged in self-inflicted harm to a certain degree." She also

7

argues that her acquittal on the strangulation charge demonstrates that that there was no evidence that the child suffered from a serious bodily injury. We disagree.

Regarding a claim that the evidence at trial was insufficient to convict, this Court has stated that

[t]he function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

*Guthrie*, 194 W. Va. at 663, 461 S.E.2d at 169, syl. pt. 1. Further,

[a] criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.

*Id.* at 663, 461 S.E.2d at 169, syl. pt. 3, in part.

Here, the record shows that D.H. was three years old when he sustained serious injuries and could not adequately communicate when questioned. While petitioner argues that the child may have inflicted the injuries on himself, medical testimony at trial refuted this theory. The medical professionals also rejected petitioner's theories that the child fell from a swing or that a hair wrapped around his penis because those theories were not consistent with the child's injuries. Further, blood work, IV fluids, X-rays, urinalysis, and other physical examinations ruled out medical causes for the injuries. The evidence demonstrated that the child's injuries were intentionally inflicted by petitioner and/or her boyfriend. Petitioner ignores this evidence and states that the perpetrator of the abuse is unknown. However, the evidence clearly showed that the child was in the exclusive care of petitioner and her boyfriend when the injuries occurred. Therefore, it is clear that the jury could find petitioner guilty beyond a reasonable doubt for child abuse creating substantial risk of death or serious bodily injury and child abuse resulting in bodily injury. As such, the circuit court did not err in denying petitioner's motions for judgment of acquittal.

Lastly, petitioner argues that the circuit court erred in instructing the jury regarding principal in the second/aider and abettor because there was insufficient evidence to support the giving of said instruction. In support, petitioner argues that there was "no evidence presented at

trial demonstrating that [D.H.] was harmed by other than accidental means, or even if he was, who the actual individual was that caused the harm." Further, she states that there was no evidence introduced at trial that petitioner "knowingly intended to assist, encourage, or facilitate" the actual commission of the offense. *State v. Foster*, 221 W. Va. 629, 636, 656 S.E.2d 74, 81 (2007) (citation omitted). She contends that there was no evidence that she was present when the child suffered his injuries and that her work schedule demonstrated that she was working for five of the seven days in July preceding the hospital visit on July 7, 2016. She states that the "jury even so much as acknowledged the lack of sufficient evidence of the [p]etitioner assisting or facilitating in any way by acquitting her" on the conspiracy charge. Based upon a review of the record, we find petitioner is entitled to no relief.

A trial court's refusal to give or actual giving of an instruction is reviewed under an abuse of discretion standard. *See Guthrie*, 194 W. Va. at 664, 461 S.E.2d at 169-70, syl. pt. 4, in part. ("Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion."). Further, this Court has noted that so long as there is "evidence tending in some appreciable degree to support the theory of proposed instructions, it is not error to give such instructions to the jury, *though the evidence be slight, or even insufficient to support a verdict based entirely on such theory*." *Craighead v. Norfolk & W. Ry. Co.*, 197 W. Va. 271, 276, 475 S.E.2d 363, 368 (1996) (citation omitted) (emphasis added).

Here, the instruction at issue stated as follows:

Under the concerted action principle, a Defendant who is present at the scene of a crime, and by acting with another contributes to the criminal act, is criminally liable for the offense as if he or she were the sole perpetrator. West Virginia law makes no distinction between principals in the first and second degree, and all persons who act in concert to commit a crime are equally guilty.

The Court instructs the jury that a principal in the first degree is defined as the person who actually perpetrated the act in question with all the requisite elements necessary for the commission of the crime.

A principal in the second degree is defined as a person who was actually present at the scene of the crime and aided and abetted the principal in the first degree to commit the criminal act.

To be convicted as an aider or abettor, the law requires that the accused in some way associate himself/herself with the venture, that he or she participate in it as in something that he or she wishes to bring about, and that he or she seeks by action to make it succeed. The state must demonstrate that a defendant shared the criminal intent of the principal in the first degree. In this regard, an accused is not required to have intended the particular crime committed by the principal in the first degree, but only to have knowingly intended to assist, encourage or facilitate the design of the criminal actor.

9

The intent element is relaxed where there is evidence of substantial physical participation in the crime by an accused. Substantial physical participation by an aider and abettor in a criminal undertaking constitutes evidence from which a jury may properly infer an intent to assist the principal criminal actor.

Proof that a defendant was present at the time and place the crime was committed is a factor to be considered by the jury in determining guilt, along with other circumstances, such as the defendant's association with or relation to the perpetrator and the aider or abettor's conduct before and after the commission of the crime, including an attempt to conceal the crime or conceal a defendant's role in the crime.

Merely witnessing a crime, without intervening, does not make a person a party to its commission unless the non-interference was designed and operated as an encouragement to or protection of the perpetrator.

Thus, being a principal in the second degree is not itself a separate crime but is a basis for finding liability for the underlying crime. In essence, evidence of such complicity as principal in the second degree simply establishes an alternative theory of criminal liability, that is, another way of committing the underlying substantive offense.

During counsels' arguments below and in response to petitioner's assertion that it was questionable whether any crime had been committed, the circuit court noted "[i]sn't there evidence of a crime here though? I mean, several witnesses had indicated that a crime was committed." The circuit court deemed the evidence sufficient to give the instruction. The evidence demonstrated that petitioner and her boyfriend behaved in a manner that indicated that they may have been covering for each other. For example, they initially prohibited the child's grandmother from coming into the child's hospital room and became angry when the medical professionals asked to photograph the child's injuries. Petitioner refused to allow them to take photographs, as instructed by her boyfriend, until a warrant was obtained. Further, during her interview with law enforcement, petitioner denied her boyfriend's involvement in the child's injuries and the boyfriend subsequently refused to give a statement. The evidence also indicated that the child was in petitioner and her boyfriend's exclusive custody after the July 4, 2016, celebration until they took him to the hospital on July 7, 2016. Medical testimony established that the child sustained the injuries just prior to arriving at the hospital on July 7, 2016. Thus, evidence existed for the jury to determine whether a crime was committed and whether petitioner directly committed it, or whether she and her boyfriend acted together. Therefore, we find the circuit court did not abuse its discretion in giving instructions regarding principal in the second/aider and abettor.

For the foregoing reasons, the circuit court's January 22, 2018, order is hereby affirmed.

Affirmed.

**ISSUED**: September 13, 2019

**CONCURRED IN BY**:

Chief Justice Elizabeth D. Walker
Justice Margaret L. Workman
Justice Tim Armstead
Justice Evan H. Jenkins
Justice John A. Hutchison